UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

———————————————————————

DAVID RUSIN,

                              Plaintiff,     **No. 6:15-cv-06593(MAT)**
                                             **DECISION AND ORDER**

              -vs-

CAROLYN W. COLVIN, Acting
Commissioner of Social Security,

                              Defendant.

———————————————————————

## INTRODUCTION

David Rusin ("Plaintiff"), represented by counsel, brings this action pursuant to Title II of the Social Security Act ("the Act"), seeking review of the final decision of the Commissioner of Social Security ("the Commissioner") denying his application for Disability Insurance Benefits ("DIB"). This Court has jurisdiction over the matter pursuant to 42 U.S.C. §§ 405(g), 1383(c).

## PROCEDURAL STATUS

Plaintiff protectively filed an application for DIB on August 2, 2012, alleging disability beginning on September 15, 2010. (T.147-50, 1691).[1] After the Commissioner initially denied the application (T.106-09), Plaintiff requested a hearing, which was held before administrative law judge Connor O'Brien ("the ALJ") on December 11, 2013. (T.36-93). Plaintiff appeared with his attorney and testified, as did impartial vocational expert Peter A.

---

[1]
    Citations to "T." in parentheses refer to pages from the certified transcript of the administrative record, filed electronically by the Commissioner (Dkt #9).

Manzi ("the VE"). A request for vocational interrogatory was sent to the VE on March 28, 2014, who replied on April 4, 2014. The VE's answers were proffered to Plaintiff on April 7, 2014; however, Plaintiff did not reply to the proffer. On July 22, 2014, the ALJ issued a decision finding Plaintiff is not disabled under the Act. (T.19-35). The Appeals Council denied Plaintiff's request for review on August 28, 2015, making the ALJ's decision the final decision of the Commissioner. (T.1-5). This timely action followed.

Plaintiff moved for judgment on the pleadings (Dkt #10) pursuant to Rule 12(c) of the Federal Rules of Civil Procedure, and the Commissioner cross-moved (Dkt #12) for the same relief. The parties have comprehensively summarized the administrative transcript in their briefs (Dkt ##10-1, 12-1), and the Court adopts and incorporates these factual summaries by reference. The Court will discuss the record evidence in further detail below, as necessary to the resolution of the parties' contentions.

For the reasons discussed below, the Commissioner's decision is affirmed.

## THE ALJ'S DECISION

The ALJ followed the five-step sequential evaluation process promulgated by the Commissioner for deciding disability claims. At step one, the ALJ found that Plaintiff had not engaged in substantial gainful activity ("SGA") since September 15, 2010. (T.21). The ALJ noted Plaintiff's testimony that he provided consultative support in the form of giving an opinion on

investment; this occurred during three-hour conference call, and Plaintiff did not receive any compensation for it. Additionally, for the past few years, he has served on RIT's President's Circle, a group that discusses long-term strategies and meets twice per year. Plaintiff stated that he offers input for these meetings as well. The ALJ found that these consulting activities do not qualify as SGA because Plaintiff receives no payment for these essentially volunteer positions.

At step two, the ALJ found that Plaintiff has the following "severe impairments": depressive disorder, anxiety disorder and personality disorder. (T.21). Plaintiff confirmed at the hearing that he confirmed at the hearing that he is not alleging any physical impairments or limitations.

At the third step, the ALJ found that none of Plaintiff's impairments, considered singly or in combination, meet or equal the criteria of an impairment in the Listing of Impairments at 20 C.F.R. Part 404, Subpart P, Appendix 1. (T.22).

Before proceeding to the fourth step, the ALJ found that Plaintiff has the residual functional capacity ("RFC") to perform a full range of work at all exertional levels but with the following nonexertional limitations: he has no cognitive limitations and can occasionally make judgments and decisions; he cannot supervise others or be responsible for another's work; he can work toward daily, or monthly goals, but not at an automated, machine-drive, assembly-line production pace; and he requires up to

three short, less-than-5-minute breaks in addition to regularly scheduled breaks. (T.23).

At step four, the ALJ determined that Plaintiff cannot perform his past relevant work as a chief executive officer of a privately-held corporation. (T.29). The VE classified this work, under the Dictionary of Occupational Titles ("DOT"), as a "president," DOT #189.117-026, sedentary, skilled, with a specific vocational profile of 8.

At the fifth step, the ALJ found that, considering Plaintiff's age, education, work experience, and RFC, he has acquired work skills, in his past relevant work, that are transferable to other occupations with jobs that exist in significant numbers in the national economy. (T.29-30). Accordingly, the ALJ entered a finding of not disabled under the Act.

## SCOPE OF REVIEW

When considering a claimant's challenge to the decision of the Commissioner denying benefits under the Act, the district court is limited to determining whether the Commissioner's findings were supported by substantial record evidence and whether the Commissioner employed the proper legal standards. Green-Younger v. Barnhart, 335 F.3d 99, 105-06 (2d Cir. 2003). The district court must accept the Commissioner's findings of fact, provided that such findings are supported by "substantial evidence" in the record. See 42 U.S.C. § 405(g) (the Commissioner's findings "as to any fact, if supported by substantial evidence, shall be conclusive").

The reviewing court nevertheless must scrutinize the whole record and examine evidence that supports or detracts from both sides. Tejada v. Apfel, 167 F.3d 770, 774 (2d Cir. 1998) (citation omitted). "The deferential standard of review for substantial evidence does not apply to the Commissioner's conclusions of law." Byam v. Barnhart, 336 F.3d 172, 179 (2d Cir. 2003) (citing Townley v. Heckler, 748 F.2d 109, 112 (2d Cir. 1984)).

**DISCUSSION**

## I.   Failure to Give Controlling Weight to Treating Psychiatrist's Opinion

Plaintiff asserts that the ALJ erroneously assigned "minimal weight" (also described by the ALJ as "little weight") to the opinion of Dr. Thomas Letourneau, Plaintiff's treating psychiatrist since 1998. (T.24, 28).

The Second Circuit has explained that "[a]lthough the treating physician rule generally requires deference to the medical opinion of a claimant's treating physician, the opinion of the treating physician is not afforded controlling weight where . . . the treating physician issued opinions that are not consistent with other substantial evidence in the record. . . ." Halloran v. Barnhart, 362 F.3d 28, 32 (2d Cir. 2004) (per curiam) (internal and other citations omitted). When an ALJ declines to accord controlling weight to a treating physician's opinion, the ALJ "must consider various 'factors' to determine how much weight to give to the opinion[,]" id. (quoting 20 C.F.R. § 404.1527(d)(2)), such as

"(i) the frequency of examination and the length, nature and extent of the treatment relationship; (ii) the evidence in support of the treating physician's opinion; (iii) the consistency of the opinion with the record as a whole; (iv) whether the opinion is from a specialist;  and (v) other factors brought to the Social Security Administration's attention that tend to support or contradict the opinion.'" Id. (quoting 20 C.F.R. § 404.1527(d)(2)).

A corollary to the treating physician rule is the so-called "good reasons rule," which is based on the regulations specifying that "the Commissioner 'will always give good reasons'" for the weight given to a treating source opinion. Halloran, 362 F.3d at 32 (quoting 20 C.F.R. § 404.1527(d)(2); citing 20 C.F.R. § 416.927(d)(2); Schaal v. Apfel, 134 F.3d 496, 503-04 (2d Cir. 1998)). "Those good reasons must be 'supported by the evidence in the case record, and must be sufficiently specific . . . .'" Blakely v. Commissioner of Social Sec., 581 F.3d 399, 406 (6th Cir. 2009) (quoting Social Security Ruling ("SSR") 96-2p, 1996 WL 374188, at *5 (S.S.A. July 2, 1996)). Because the "good reasons" rule exists to "ensur[e] that each denied claimant receives fair process," Rogers v. Commissioner of Social Sec., 486 F.3d 234, 243 (6th Cir. 2007), an ALJ's "'failure to follow the procedural requirement of identifying the reasons for discounting the opinions and for explaining precisely how those reasons affected the weight' given 'denotes a lack of substantial evidence, even where the conclusion of the ALJ may be justified based upon the record.'"

Blakely, 581 F.3d at 407 (quoting Rogers, 486 F.3d at 243; emphasis in Blakely).

Here, the regulatory factors regarding the length of the treatment relationship and the nature of Dr. Letourneau's practice support a finding that he is a treating source: Dr. Letourneau is a specialist in the field of psychiatry, and he treated Plaintiff on a consistent basis (sometimes weekly) since at least 1998. Indeed, the ALJ acknowledged that the "frequency, length, nature and extent of treatment" by Dr. Letourneau qualified him as a treating source, and the Commissioner here does not dispute that Dr. Letourneau qualifies as a treating source.

Referring to Dr. Letourneau's November 2010 report, the ALJ found that notwithstanding Dr. Letourneau's "treating relationship with the claimant, this assessment cannot be given more than minimal weight." (T.24). The ALJ explained,

> While the claimant reports that he devalued his work for the last few years as C.E.O., he also testified to making significant determinations regarding the sale and distributions of his company, for the benefit of his employees and against the more self-interested advice of others. His actions demonstrate independence of thought and the ability to negotiate the sale. His opinion on matters of investment and economics continues to be relied upon by others in the industry. Thus, while Dr. Letourneau accepts the claimant's reports of his inability to function, the claimant's actions and the response of others in negotiations and in investment circles belies the degree of infirmity feared by Dr. Letourneau.

(T.24). The ALJ proceeded to discuss certain of Dr. Letourneau's subsequent office notes that documented an improvement in Plaintiff's mood and outlook. For instance, although in October

-7-

2010, Plaintiff reported that he had been making funeral arrangements as part of his suicide plans, by December 2010, Dr. Letourneau reported an improvement in mood. According to the ALJ, "[w]hile the claimant reports serious symptoms, and clearly had been working his way through a painful divorce, the record establishes that he has experienced chronic depression since childhood, and that he kept his negative thoughts at bay by engaging in activities, albeit from a 'bucket list' perspective; [that is,] describing activities that he needed to complete before his life was over." (T.24-25) (citation omitted).

The ALJ noted that Plaintiff continued to treat regularly with Dr. Letourneau into 2012, and by March 2012, his depression was reported to be in partial remission. (T.29) (citing T.283). The ALJ stated that despite "the recognized improvement, Dr. Letourneau made the following contradictory statements: 'His depression is definitely better. But the divorce is life threatening.'" (Id.) (quoting T.289). However, in May 2013, Dr. Letourneau found "no serious mental status abnormalities" on examination of Plaintiff and noted that "for the first time in a long time, [he] was more hopeful that [Plaintiff] would not commit suicide." (T.29) (quoting T.328). Plaintiff was diagnosed with major depressive disorder, recurrent, in partial remission; and personality disorder. "In August 2013, post-divorce proceedings," Dr. Letourneau reported that Plaintiff was

> [m]ore animated, more hopeful. [Plaintiff]'s mood is
> euthymic with no signs of depression or manic process.

> His speech is normal in rate, volume, and articulation and his language skills are intact. Assaultive or homicidal ideas or intentions are convincingly denied. Hallucinations and delusions are denied and there is no apparent thought disorder. Associations are intact, thinking is generally logical and thought content is appropriate. Cognitive functioning, based on vocabulary and fund of knowledge, is intact and age appropriate and he is fully oriented. There are no signs of anxiety apparent. He exhibits no signs of attentional or hyperactive difficulties. Insight and social judgment appear intact.

(T.30-31) (citing T.347).

Reviewing Plaintiff's "most recent treatment records with Dr. Letourneau, the ALJ found they "reveal[ed] that [Plaintiff] denied suicidal ideas and that his depressive disorder remained in partial remission." (T.28) (citing T.395). The ALJ found these observations "at odds" with Dr. Letourneau's opinion on December 8, 2013, that Plaintiff "has a poor prognosis with multiple symptoms of depression, including sleep disturbance, disturbance of mood or affect, withdrawal and difficulty thinking or concentrating," "is unable to remember work-like procedures, maintain attention for two-hour segments, complete a normal workday without interruptions from psychologically based symptoms or deal with normal work stress," "cannot interact appropriately with the general public and on average would miss work more than four days per month." (T.31) (citing T.398-402).

The ALJ further found Dr. Letoureau's opinions as being "at odds with the other medical evidence," such as treatment notes from Plaintiff's primary care doctor, Dr. Christopher Momont, who also had a treating relationship with Plaintiff. On May 5, 2011, when

discussing his on-going depression, Plaintiff told Dr. Momont that
he had "'recently sold his business, and it has given him a more
positive outlook on things.'" (T.28) (citing T.247). At a routine
health maintenance exam on May 12, 2012, Dr. Momont, while aware of
Plaintiff's chronic depression, "ha[d] no concern over
[Plaintiff]'s weight or any weight loss" and noted that Plaintiff
"adamantly denie[d] any thoughts of wanting to harm himself in any
way." (T.28) (citing T.241). Plaintiff told Dr. Momont that "his
only side effect from the depression is that he is slightly
forgetful, with some issues of insomnia," and he "related that his
insomnia has improved slightly with transcranial therapy." (T.28).
The ALJ found that Dr. Momont's "observations are more in line with
the [Plaintiff]'s activities—such as continuing to provide
investment advice to business associates, assisting his mother with
household repairs and the care of his brother, driving himself to
appointments, and going to Boston to visit his daughter's college."
(T.28).

    Likewise, on April 17, 2012, despite the "reports of impulsive
suicidal thoughts" in the record, Dr. Mahipal Chaudhri indicated
that "'[t]he patient denies suicidal ideations or homicidal
ideations, intent or plan. The patient is hopeful and futuristic.'"
(T.25) (citing (T.254). In April 2012, Plaintiff also saw primary
care physician Dr. Momont, who noted that Plaintiff "appeared
clinically stable from a mental health perspective, and . . .
denied thoughts of harming himself[.]" (T.26) (citing T.243).

In summary, the ALJ determined that Dr. Letourneau's opinions deserved "little weight" because "his own treatment notes, outlined above, reveal[ed] objective findings," including Plaintiff's "depression going into partial remission, the obvious improvements evidenced, and disparity between [Plaintiff]'s reports versus [Plaintiff]'s activities that do not support his extreme assessments." (T.28).

Contrary to Plaintiff's suggestion, the Commissioner's regulations permit an ALJ to consider an opinion's consistency with other evidence in the record when determining how to weight the opinion. See 20 C.F.R. § 404.1527(c)(4). That said, Plaintiff is correct that "[c]ourts generally do not take an ALJ's conclusion that a treating physician's own treatment notes contradict the record as a whole at face value; rather, they require the mentioning of specific findings that would support such a conclusion." Pidkaminy v. Astrue, 919 F. Supp.2d 237, 244 (N.D.N.Y. 2013) (citing Briest v. Comm'r of Soc. Sec., No. 5:07-CV-121, 2010 WL 5285307, at *5 (N.D.N.Y. Dec. 17, 2010) (holding that the ALJ failed to follow the guidelines for evaluating the opinion of a treating physician by merely stating that the claimant's psychiatrists' treatment notes were inconsistent with his overall ability to engage in gainful activity and failing to consider other factors found in 20 C.F.R. § 404.1527(d)(2)); other citation omitted). Here, however, as discussed above, the ALJ referenced specific medical evidence and testimonial and explained how it was

inconsistent with Dr. Letourneau's highly restrictive statements about Plaintiff's mental functioning. For instance, as the ALJ noted, Plaintiff reported assisting a friend in political fundraising, participating in a 3-hour conference call advising Harvard University's endowment fund on investment strategies, and applying for CEO positions. (T.278, 330, 336). See Wavercak v. Astrue, 420 F. App'x 91, 94 (2d Cir. 2011) (unpublished opn.) (finding that "the ALJ was not required to defer to [treating source] Dr. Eppolito's opinion" where "Dr. Eppolito's assessments were called into question by other medical evidence in the record, including his own earlier reports which did not always conclude that Wavercak was unable to engage in any sedentary work during the relevant period . . . [and] conflicted with Wavercak's description of his daily activities") (citing 20 C.F.R. §§ 404.1527(d)(2)(i)-(ii), (d)(3)-(6) (explaining that deference accorded to treating physician's opinion may be reduced based on consistency of opinion with rest of medical record, and any other elements "which tend to . . . contradict the opinion")); Pidkaminy, 919 F. Supp.2d at 245 (ALJ did not err in explaining decision not to give controlling weight to the opinion of disabilitiy claimant's treating physician; ALJ specified what weight he accorded to the physician's opinion and provided sufficient reasons for doing so, considered the length of the treating relationship, the fact that the physician was a specialist, and all the evidence on which the

-12-

physician relied to support his opinions, and noted and explained
the various inconsistencies between the physician's treatment
records, claimant's own statements, and the opinions of
non-examining State agency consultants).

Plaintiff argues that contrary to the ALJ's assertions,
Dr. Letourneau's opinions are supported by the reports of
consultative psychologist Sherry Schwartz, Ph.D.; and independent
medical examiner John Langfitt, Ph.D., who conducted a two-day
neurological examination of Plaintiff on behalf of Plaintiff's
insurer.  The Court finds that the ALJ's conclusion that these
opinions did not support Dr. Letourneau's opinion is underpinned by
substantial evidence in the record, and that the ALJ adequately
explained this decision.  Turning first to Dr. Schwartz's
consultative opinion, the results of her mental status examination,
apart from noting Plaintiff's depressed mood and restricted affect,
were largely normal: Plaintiff's speech and language were fluent,
clear and adequate; his thoughts were coherent and goal-irected
with no hallucinations, delusions or paranoia; he was oriented,
with intact attention and concentration, and intact recent and
remote memory; his cognitive function was above average; and his
insight and judgment were good. Dr. Schwartz opined that Plaintiff
can follow and understand simple directions and instructions,
perform simple tasks independently, maintain concentration and
attention, maintain a regular schedule, learn new tasks, and

perform complex tasks independently; but he cannot make appropriate decisions, relate adequately with others, or appropriately deal with stress. The ALJ rejected Dr. Schwartz's assessment regarding Plaintiff's ability to interact with others and deal with stress because it was "based on what the claimant reported and not on her observations over time" and failed to "provide specific limitations in decision making, relating or stress." The ALJ explained that "[t]o the extent that Dr. Schwartz suggests that [Plaintiff] can have no interaction [with people], make no decisions, and handle no stress, such an interpretation is unsupportable" because "[e]ven the basic activities of daily life—choosing clothing, driving to the store and making a purchase—require some degree of these functions," and Plaintiff "acknowledges his capacity for multiple activities requiring some functioning . . . ." (T.27).

Similarly, the ALJ's evaluation of Dr. Langfitt's report is supported by substantial evidence. Notably, the question posed to Dr. Langfitt by Plaintiff's insurer was fairly narrow—that is, whether Plaintiff still can function, notwithstanding his mental impairments, in a CEO-type role. The gist of Dr. Langfitt's narrative opinion is that Plaintiff is currently very limited in performing most of the tasks required of a typical CEO; he works extremely slowly on cognitive tasks and projects a very negative emotional tone. However, Dr. Langfitt did not perform a function-by-function assessment of Plaintiff's abilities to perform basic

work activities such as what would be required in an unskilled or semiskilled job. While Dr. Langfitt opined that Plaintiff should be restricted from making major life decisions without advice from people who knew him well, he qualified those as being decisions involving large amounts of money, Plaintiff's estate and Plaintiff's living situation. While decisions involving large amounts of money are typically required in an executive leadership employment position, they are not involved in most jobs. Furthermore, decisions involving end of life planning and domestic situations are likewise not involved in most jobs. The ALJ thus accurately characterized Dr. Langfitt's report when she stated that "the limitations offered by Dr. Langfitt may preclude [Plaintiff]'s past work [as a CEO], but [they] do[ ] not necessarily preclude other work activities." (T. 26).

Neuropsychologist Dr. Michael Santa Maria, Ph.D. conducted in independent medical examination of Plaintiff on January 9, 2012, at the request of his attorney (not the attorney or firm representing him in connection with the present disability claim and appeal). Dr. Santa Maria noted that Plaintiff has history of a difficult childhood involving ongoing abuse in the home through childhood with lingering prominent symptoms of depression and anxiety. While Dr. Santa Maria considered Plaintiff to meet diagnostic criteria for Posttraumatic Stress Disorder (PTSD) which is an Anxiety Disorder, based on his childhood experiences, and Major Depresssive

Disorder, Severe Without Psychotic Features, Chronic, he found there was not evidence, based on the clinical interview, the records review, and the comprehensive personality inventory, of any comorbid Personality Disorder. Dr. Santa Maria also performed an extensive battery of neuropsychological tests, including the Benton Temporal Orientation Test, Mini Mental State Exam, various tests assessing sensory and motor functioning, tests to measure premorbid intelligence such as the North American Adult Reading Test, multiple WAIS-4 intelligence tests to measure current intelligence, and numerous tests measuring academic abilities, language abilities, spatial abilities, learning and memory, memory/effort, and executive functioning. Dr. Santa Maria found that Plaintiff's performance on the current cognitive evaluation was "compatible with some scattered mild-range impact of mood and anxiety symptoms on some aspects of memory, attention and processing speed." Dr. Santa Maria was presented with a specific question, to "identify any psychiatric diagnoses; conditions or personality disorders that may be present, and to the extent possible, assess the severity of any condition identified and the impact that condition might be expected to have on [Plaintiff]'s work capacity and, in particular, his ability to competitively perform the duties of a CEO." In answer to that question, Dr. Santa Maria did "not foresee" Plaintiff "effectively demonstrating attentional focus, motivation and follow-through to effectively handle CEO duties in

-16-

a typical company full-time/greater than full-time at least 5 days/week as would be expected of a CEO for a typical company, given his prominent current depression and anxiety/PTSD." However, Dr. Santa Maria concluded, the "cognitive data support that [Plaintiff] demonstrates adequate cognitive capacity to handle a variety of *modestly demanding work roles in various sectors of the economy*." Thus, while Dr. Santa Maria's opinion supports a finding that Plaintiff can no longer function effectively as a CEO, his opinion does not actually support Plaintiff's claim of being totally disabled as defined by the Act.

To the extent that Plaintiff argues that the ALJ's decision must be overturned because he did not give controlling weight to any medical opinion in particular, the Second Circuit has found the failure of an RFC to align completely with an acceptable source's medical opinion, standing alone, does not amount to reversible error. See, e.g., Matta v. Astrue, 508 F. App'x 53, 56 (2d Cir. 2013) (unpublished opn.) ("[The claimant] asserts that the ALJ substituted his own medical judgment for these expert opinions in concluding that 'substantial evidence revealed [the claimant's] condition stabilized and at the most, he had moderate symptoms.' We disagree. Although the ALJ's conclusion may not perfectly correspond with any of the opinions of medical sources cited in his decision, he was entitled to weigh all of the evidence available to make an RFC finding that was consistent with the record as a

-17-

whole.") (citing <u>Richardson v. Perales</u>, 402 U.S. 389, 399 (1971) ("We therefore are presented with the not uncommon situation of conflicting medical evidence. The trier of fact has the duty to resolve that conflict.")).

## II.   **Erroneous Credibility Assessment**

When assessing a claimant's credibility, the ALJ must consider both his medical records and his reported symptoms. <u>See</u> 20 C.F.R. § 404.1529. "Under the regulations, an individual's statement(s) about his or her symptoms is not enough in itself to establish the existence of a physical or mental impairment or that the individual is disabled." SSR 96-7p, 1996 WL 374186, at *1 (S.S.A. July 2, 1996). The ALJ employs a two-step process to evaluate a claimant's self-reported symptoms. <u>See</u> 20 C.F.R. § 404.1529(a); SSR 96-7p, at *2. First, the ALJ determines if the claimant has medically determinable impairments that could produce the alleged symptoms. Second, if such impairments exist, the ALJ evaluates the intensity, persistence, and limiting effects of the symptoms to determine the extent to which those symptoms limit the claimant's ability to work. <u>See</u> <u>id.</u> In so doing, the ALJ considers (1) the claimant's daily activities; (2) the location, duration, frequency, and intensity of the claimant's pain or other symptoms; (3) precipitating and aggravating factors; (4) type, dosage, effectiveness, and side effects of any medication the claimant takes or has taken to relieve his pain or other symptoms; (5) other

treatment the claimant receives or has received to relieve his pain or other symptoms; any measures the claimant takes or has taken to relieve his pain or other symptoms; and (6) any other factors concerning the claimant's functional limitations and restrictions due to his pain or other symptoms. <u>See</u> 20 C.F.R. § 416.929(c)(3)(i)-(vii); SSR 96-7p, at *3.

The ALJ, in evaluating Plaintiff's subjective symptomatology, found that while "the objective medical evidence does provide a basis for finding that [he] has more than minimal restrictions arising from his impairments," "[t]he objective medical evidence does not support the extent of the limitations alleged." (T.29). Section 404.1529(c)(2) permits an ALJ to consider objective medical evidence, which, although not dispositive, can be "a useful indicator to assist . . . in making reasonable conclusions about the intensity and persistence of [the claimant's] symptoms and the effect those symptoms, such as pain, may have on [the] ability to work." The ALJ noted that "the treatment notes and observations offered by Dr. Momont, Dr. Chaudhri, Dr. Langfitt, and Dr. Letourneau indicate that Plaintiff has suffered from chronic mental impairments that pre-date his disability claim," and that while Plaintiff "has sometimes presented with less than the grooming and command of a CEO, mental status examinations throughout treatment reflect a greater capacity than alleged." (T.29). Plaintiff's mental status examinations, as discussed above,

consistently showed that he had logical and goal-directed thought processes, intact cognitive functioning and memory, fair or good judgment, normal attention span and concentration. (T.326, 328, 330, 332, 334, 336, 338, 351, 395).

The ALJ also properly considered the nature and extent of Plaintiff's daily activities in finding that his subjectively reported symptoms were not as severe as he alleged. (T.24, 29). See 20 C.F.R. §§ 404.1529(c)(3)(i) (allowing an ALJ to consider a claimant's daily activities when evaluating the severity of subjective complaints). In particular, the ALJ noted that Plaintiff's "actions demonstrate independence of thought and the ability to negotiate the sale" of his business in 2010, and Plaintiff's "opinion on matters of investment and economics continues to be relied upon by others in the industry" (T.24), as evidenced by his participating in political fundraising, providing high-level input on investments and strategy to Harvard's endowment fund on investments and RIT's President's Circle, and providing input to lawyers and accountants on the viability of companies (T.54, 278, 330, 336). There is substantial evidence in the record to support a finding that Plaintiff's day-to-day activities were inconsistent with his reports to treating psychiatrist Dr. Letourneau and other providers that he has a near complete inability to function due to his depression and anxiety. In sum, the ALJ did not misapply the relevant legal standards in evaluating

the credibility of Plaintiff's subjective complaints, and the Court finds substantial evidence in the record to support the ALJ's credibility assessment.

## CONCLUSION

For the foregoing reasons, the Court finds that the ALJ's decision was free of legal error and supported by substantial evidence. Accordingly, Plaintiff's Motion for Judgment on the Pleadings is denied, Defendant's Motion for Judgment on the Pleadings is granted, and the Commissioner's decision is affirmed. The Clerk of the Court is directed to close this case.

**SO ORDERED.**

**S/Michael A. Telesca**

_____
     HON. MICHAEL A. TELESCA
     United States District Judge

Dated:     January 5, 2017
           Rochester, New York.